UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

GILL INDUSTRIES, INC.,

    Plaintiff/Counter-Defendant,

vs.

REI AUTOMATION, INC.,

    Defendant./Counter-Plaintiff.

Case No. 1:18-cv-00106-PLM-RSK

HON. PAUL L. MALONEY

## PLAINTIFF'S ANSWER TO DEFENDANT'S COUNTERCLAIM

Plaintiff/Counter-Defendant Gill Industries, Inc., through its counsel, answers Defendant/Counter-Plaintiff's Counterclaim as follows:

1. This dispute between REI and Gill (together, the "parties") arose from the aftermath of Gill's loss of a project for Volkswagen. Prior to Gill's loss of the Volkswagen project, Gill had contracted with REI to purchase four robotic welding cells, which were to be used specifically in furtherance of Gill's work for Volkswagen. When Volkswagen terminated its relationship with Gill with respect to the project for which the cells were to be used, Gill asked, and REI agreed, to modify its pre-existing purchase orders such that REI would provide Gill with three — rather than four — robotic weld cells and associated components, which REI would reconfigure to make them of more universal use, as Gill could no longer use them as originally intended.

**ANSWER:** To the extent that the allegations in this Paragraph are inconsistent with the allegations set forth in Gill's complaint, they are denied as untrue.

2. The parties' restructured agreement was memorialized in a change order dated June 30, 2016. REI delivered the machinery to Gill as agreed. On or about October 12, 2106, Gill accepted the machinery and certified that it was acceptable.

**ANSWER:** **Denied as untrue.**

3. Nevertheless, Gill never paid the remaining $115,326.50 due to REI for the accepted machinery or an additional $4,990 that Gill incurred for REI's service work. Gill never raised any issues with the completeness of REI's performance under the parties' change order until May 2017, after REI took stronger measures to collect Gill's unpaid invoices. It was only then that Gill asserted, contrary to the plain language of the parties' change orders, that REI was supposed to have delivered additional machinery. Gill's pre-emptive lawsuit followed.

**ANSWER:** **Denied as untrue.**

### PARTIES, JURISDICTION AND VENUE

4. REI is a South Carolina Corporation whose principal place of business is located at 1240 Veterans Road, Columbia, South Carolina 29209.

**ANSWER:** **Admitted.**

5. Gill is a Michigan corporation whose principal place of business is located at 5271 Plainfield Ave Grand Rapids, MI 49525.

**ANSWER:** **Admitted.**

6. Venue and jurisdiction are proper in this Court.

**ANSWER:** **Admitted.**

## GENERAL ALLEGATIONS

7. REI Automation is an industry leader in providing custom industrial equipment and automation solutions in the automotive, medical, nuclear, heavy vehicle, communications, energy, and consumer goods markets.

**ANSWER:** **Gill lacks knowledge or information sufficient to admit or deny the allegations in this Paragraph.**

8. Gill deals in the business of precision-engineered assemblies and modules for the automotive, multi-use vehicle and furniture industries.

**ANSWER:** **Admitted.**

**General Background.**

9. In or about April 2016, Gill had a contract with Volkswagen or its agents ("VW") to produce certain automobile components that required the utilization of robotic welding cells (the "Volkswagen Contract").

**ANSWER:** **Admitted that Gill had a contract to produce certain automobile components with Volkswagen as the end customer. The terms of any such contract speak for themselves, and Gill denies the allegations of this Paragraph to the extent that they are inconsistent with any such contract.**

10. In furtherance of the Volkswagen Contract, Gill and/or its agents engaged REI to provide four welding cells to Gill, each of which was comprised of various components.

**ANSWER:** **Admitted that Gill and REI entered into purchase orders regarding the provision of four welding cells to Gill. To the extent that the allegations of this Paragraph are inconsistent with this admission, they are denied as untrue.**

11. Pursuant to the parties' agreement, Gill and/or its agents sent REI Automation three purchase orders dated November 23, 2015, December 10, 2015, and April 26,

2016 (together, the "Purchase Orders") relating to the four welding cells. Copies of the Purchase Orders are attached as Exhibit A.

**ANSWER:** **The Purchase Orders referenced in this Paragraph speak for themselves. To the extent that the allegations in this Paragraph are inconsistent with the Purchase Orders, they are denied as untrue.**

**Gill Loses The Volkswagen Contract and Cancels the Weld Cell Project.**

12. On or about May 12, 2016, Steve Strubberg, an Engineering Manager at Gill, instructed REI to immediately stop work on the four welding cells.

**ANSWER:** **Admitted.**

13. On May 13, 2016, Davide Spataro, a Supplier Readiness Advanced Specialist for Volkswagen, visited REI's facilities along with another VW representative. During this visit, Mr. Spataro informed REI that VW was cancelling the Volkswagen Contract with Gill because Gill had misrepresented its inability to acceptably process and produce certain required stamped products.

**ANSWER:** **Gill lacks knowledge or information sufficient to admit or deny the allegations in this Paragraph.**

14. Mr. Spataro specifically reassured REI that REI had nothing to do with VW's cancellation of Gill's Volkswagen Contract.

**ANSWER:** **Gill lacks knowledge or information sufficient to admit or deny the allegations in this Paragraph.**

15. After REI's meeting with VW, on May 13, 2018, Steve Strubberg notified REI that the Volkswagen Contract was cancelled and reiterated that REI should stop work on the weld cell project.

**ANSWER: Admitted that Mr. Strubberg advised REI to temporarily stop work on the weld cells that were the subject of the POs. Gill lacks knowledge or information sufficient to admit or deny the remaining allegations in this Paragraph.**

16. Soon thereafter, on June 15, 2016, Jack Armstrong, the Plant Manager of Gill's facility in Trenton, Georgia, cancelled the original Purchase Orders and asked REI to "email pictures of the cells and key components as they stand now at the time of cancellation." Mr. Armstrong's e-mail is attached as Exhibit B.

**ANSWER: Any documents referenced in this Paragraph speak for themselves. The remainder of the allegations in this Paragraph are denied as untrue. By way of further answer, the parties agreed to modify their respective obligations pursuant to the Change Orders.**

17. REI relayed its cancellation costs to Gill on June 17, 2016. At that time, the cancellation cost was $1,528,196.

**ANSWER: Admitted that REI relayed cancellation costs to Gill and that the stated amount was $1,528,196. Denied as untrue that the parties formally cancelled the POs. By way of further answer, the parties agreed to modify their respective obligations pursuant to the Change Orders.**

**The Parties Restructure Their Agreement.**

18. On or about June 27, 2016, Craig Balas called Grant Phillips, REI's President, to introduce himself as replacing Steve Strubberg as REI's primary contact with Gill.

**ANSWER: Admitted.**

19. During this call, Mr. Balas acknowledged that since the Volkswagen Contract had been cancelled, there was no further need for the weld cells as they had been configured.

**ANSWER: Denied.**

20. Mr. Balas then suggested that Gill would receive better value if REI continued to add labor and materials to the project by reconfiguring the existing weld cell components to produce three weld cells, with associated pedestal welders, that were more universal in nature for use in other plants and other programs in light of the Volkswagen Contract's cancellation.

**ANSWER: Denied.**

21. Accordingly, on June 29, 2016, the parties entered into two change orders relating to Job Number 05001 (the "Change Orders"). Copies of the Change Orders are attached as Exhibit C.

**ANSWER: Admitted that the parties entered into the Change Orders. The Change Orders speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with the Change Orders, they are denied as untrue.**

22. The Change Orders changed the functionality of the parties' previous project to use the weld cell components to produce three weld cells having a more universal application, with an associated price reduction.

**ANSWER: The Change Orders speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with the Change Orders, they are denied as untrue.**

23. In entering into the Change Orders, the parties agreed that the existing Purchase Orders would be modified by their terms rather than entirely cancelling and creating new Purchase Orders.

**ANSWER:** **The Change Orders speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with the Change Orders, they are denied as untrue.**

24. The Change Orders specify that the "proposed solution or change" is that "[t]hree (3) robots will be shipped to the third party within 3 days of REI's receipt of $182,885, representing REI's costs to date on the project," and "[t]he project price will be reduced by the assembly labor required to build the duplicate cell."

**ANSWER:** **The Change Orders speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with the Change Orders, they are denied as untrue.**

**REI Ships the Products and Gill Accepts Them.**

25. REI provided Gill with all products that REI agreed to produce under the Change Orders, including the three robotic weld cells.

**ANSWER:** **Denied as untrue.**

26. REI also provided Gill with unassembled cell items which were originally to contribute to the compilation of the fourth weld cell under the parties' original agreement. Such items were delivered or made available to Gill in the state that such items were in prior to Gill's instruction to halt work on the fourth weld cell.

**ANSWER:** **Denied as untrue.**

27. To the extent that completion of the fourth cell would have required labor, assembly, development, component integration, or other work that had not been completed at the time Gill ordered REI to stop work on the original project, no such labor, assembly,

development, item integration or other component integration was provided because it was outside of the scope of the parties' Change Orders.

**ANSWER:** **The Change Orders speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with the Change Orders, they are denied as untrue. To the extent that the allegations of this Paragraph allege REI's motivation for failing to provide certain goods and services, Gill lacks knowledge or information sufficient to admit or deny those allegations.**

28. REI also provided Gill with all hardware associated with the tooling, including pneumatic clamping, custom machined clamp arms, and fixture plates.

**ANSWER:** **Denied as untrue.**

29. Gill failed to pick up certain fixture plates, among other items, which had been associated with the original project and which REI made available to Gill.

**ANSWER:** **Denied as untrue. By way of further answer, Gill picked up every item that REI made available to Gill.**

30. On October 12, 2016, Mr. Balas, with full authority and in the course and scope of his duties, signed an REI Automation Customer Acceptance Form for Job Number 5001, corresponding to purchase orders 61825-04 (for tooling) and 46912-00 (for automation) ("Acceptance Form"). A copy of the Acceptance Form is attached as Exhibit D.

**ANSWER:** **Any documents referenced in this Paragraph speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with those documents, they are denied as untrue.**

31. By signing the Acceptance Form, Gill acknowledged that "the functionality of the system is accepted." See Ex. D. REI was entitled to rely, and did rely, upon the Acceptance Form.

**ANSWER: Any documents referenced in this Paragraph speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with those documents, they are denied as untrue. To the extent that the allegations of this Paragraph allege REI's reliance upon documents, Gill lacks knowledge or information sufficient to admit or deny those allegations.**

**Gill Fails to Pay for the Accepted Products and Services.**

32. The total purchase price under the original Purchase Agreements was $1,965,180.

**ANSWER: Admitted.**

33. The Change Orders reduced the total purchase price by $118,386. Accordingly, the net total of Gill's purchase under the Change Orders was $1,846,794.

**ANSWER: Admitted.**

34. Gill has paid $1,731,467.25 against the foregoing net total of its debt to REI under the Change Orders.

**ANSWER: Admitted that Gill has paid $1,731,467.25 to REI under the Change Orders. Denied as untrue that Gill has any net debt to REI.**

35. On or about March 31, 2017, REI sent Gill Invoice No. 05001-10 in the amount of $115,326.50, reflecting Gill's shortfall of $115,326.75 of the foregoing net total of its debt to REI under the Change Orders (The "Products Debt"). A copy of invoice number 05001-10 is attached as Exhibit E.

**ANSWER:** **Any documents referenced in this Paragraph speak for themselves. To the extent that the allegations of this Paragraph are inconsistent with those documents, they are denied as untrue. Denied as untrue that Gill has any net debt to REI.**

36. Gill has not paid REI the Products Debt.

**ANSWER:** **Denied as untrue that Gill has any net debt to REI. Admitted that Gill has not paid to REI any funds additional to the funds paid under the Change Orders.**

37. The time within which Gill agreed to pay the Products Debt has expired.

**ANSWER:** **Denied as untrue.**

38. Gill did not dispute the Products Debt within the period in which it was due for payment.

**ANSWER:** **Denied as untrue.**

39. REI also performed general repair services for Gill, including repairing certain camera issues caused by Gill's erroneous reprogramming. REI valued these services at $4,990 (The "Services Debt") and rendered an invoice to Gill for the same ("Invoice 05002-5"). A copy of Invoice 05002-5 is attached as Exhibit F.

**ANSWER:** **Admitted that REI invoiced Gill for $4,990. Denied as untrue that Gill has any net debt to REI.**

40. Gill has not paid REI the Services Debt.

**ANSWER:** **Denied as untrue that Gill has any net debt to REI. Admitted that Gill has not paid to REI any funds additional to the funds paid under the Change Orders.**

41. The time within which Gill agreed to pay the Services Debt has expired.

**ANSWER:** **Denied as untrue.**

42. Gill did not dispute the Services Debt within the period in which it was due.

**ANSWER:** **Admitted.**

43. The Products Debt and the Services Debt total $120,316.75 (the "Outstanding Debt").

**ANSWER:** **Denied as untrue.**

44. The Outstanding Debt is due and owing to REI.

**ANSWER:** **Denied as untrue.**

## COUNT I

## BREACH OF CONTRACT

### (Product Debt)

45. The allegations in the previous paragraphs are incorporated by reference as if fully restated herein.

**ANSWER:** **Gill incorporates by references each of its previous answers.**

46. REI and Gill entered into the Change Orders, which modified the Purchase Orders and forms a valid contract (the "Contract").

**ANSWER:** **Admitted that REI and Gill entered into the Change Orders, which speak for themselves. To the extent that the allegations in this Paragraph are inconsistent with the Change Orders, they are denied as untrue.**

47. REI fully performed its obligations under the Contract.

**ANSWER:** **Denied as untrue.**

48. Gill has breached the Contract by failing to pay REI the Product Debt as agreed thereunder and which remains outstanding.

**ANSWER:** **Denied as untrue.**

49. REI has been damaged as a result of Gill's breach and is entitled to money damages in an amount not less than $115,326.75, plus costs and pre-judgment interest.

**ANSWER:** **Denied as untrue.**

## COUNT II

## BREACH OF CONTRACT

### (Services Debt)

50. The allegations in the previous paragraphs are incorporated by reference as if fully restated herein.

**ANSWER:** **Gill incorporates by references each of its previous answers.**

51. REI agreed to perform maintenance on certain of Gill's robotic equipment in exchange for remuneration from Gill (the "Services Agreement").

**ANSWER:** **Admitted.**

52. REI performed maintenance on certain of Gill's robotic equipment.

**ANSWER:** **Admitted.**

53. REI issued Invoice 05002-5 to Gill, totaling $4,990, on account of such maintenance.

**ANSWER:** **Admitted that REI invoiced Gill for $4,990. Denied as untrue that Gill has any net debt to REI.**

54. Gill has not paid Invoice 05002-5.

**ANSWER:** **Denied as untrue that Gill has any net debt to REI. Admitted that Gill has not paid to REI any funds additional to the funds paid under the Change Orders.**

55. Gill has breached the Services Agreement by failing to pay REI the Services Debt as agreed thereunder and which remains outstanding.

**ANSWER:** **Denied as untrue.**

56. REI fully performed its obligations under the Services Agreement.

**ANSWER:** **Denied as untrue.**

57. REI has been damaged as a result of Gill's breach and is entitled to money damages in an amount not less than $4,990, plus costs and pre judgment interest.

**ANSWER:** **Denied as untrue.**

## COUNT III

## UNJUST ENRICHMENT

58. The allegations in the previous paragraphs are incorporated by reference as if fully restated herein.

**ANSWER:** **Gill incorporates by references each of its previous answers.**

59. Even if the Court were to find that there was no binding Contract or Services Agreement, as alleged above, REI conferred a substantial benefit upon Gill by providing Gill with products and services, as alleged herein, which were valued in an amount in excess of the monies that Gill has paid to REI.

**ANSWER:** **Denied as untrue.**

60. Gill's conduct in connection with the Product Debt was unjust and inequitable.

**ANSWER:** **Denied as untrue.**

61. Gill's conduct in connection with the Services Debt was unjust and inequitable.

**ANSWER:** **Denied as untrue.**

62. Through its conduct, Gill has been unjustly enriched.

**ANSWER:** **Denied as untrue.**

63. It would unjust for Gill to retain the benefit of REI's products and services because Gill failed to pay REI their equivalent value.

**ANSWER:** **Denied as untrue.**

## **AFFIRMATIVE DEFENSES**

Gill states:

1. REI's counterclaims fail to state a claim upon which relief may be granted.

2. REI's counterclaims fail in whole or in part due to the doctrine of unclean hands.

3. REI's claims are barred by the language of the Change Orders.

4. REI has failed to mitigate its damages, if any.

5. REI's claims are barred in whole or in part by Gill's right of set-off.

6. Gill reserves the right to assert additional affirmative defenses in light of the facts revealed through discovery or otherwise as disclosed through discovery or through the course of litigation.

|  |  |
|---|---|
|  | MILLER JOHNSON |
| Dated: August 8, 2018 | By: /s/ Stephen J. van Stempvoort <br> Stephen J. van Stempvoort (P79828) <br> 45 Ottawa Avenue SW, Suite 1100 <br> P.O Box 306 <br> Grand Rapids, MI 49503 <br> vanstempvoorts@millerjohnson.com <br> (616) 831-1700 |